UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION** at **LEXINGTON**

MITSUI SUMITOMO INSURANCE USA,  )
INC. as subrogee of ASAHI         )
BLUEGRASS FORGE CORPORATION,      )
                                   )
    Plaintiff,            )    Civil Case No.
                                   )    5:18-cv-152-JMH
                                   )
V.                                 )
                                   )
DENHAM-BLYTHE COMPANY, INC.,       )    **MEMORANDUM OPINION**
*et al.,*                          )    **AND ORDER**
                                   )
    Defendants.           )

** ** ** ** **

This matter comes before the Court on Defendant Denham-Blythe Company, Inc's ("Denham-Blythe") Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) [DE 20] and Defendant BlueScope Buildings North America, Inc.'s ("BlueScope") Motion for Judgment on the Pleadings [DE 28]. Having considered the matter fully, and being otherwise sufficiently advised, the undersigned will grant Defendant Denham-Blythe's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) [DE 20] and deny Defendant BlueScope's Motion for Judgment on the Pleadings [DE 28].

## FACTUAL AND PROCEDURAL BACKGROUND

This case arises from a January 31, 2011 design-build contract ("the Contract") between Asahi Bluegrass Forge Corporation ("Asahi") and Denham-Blythe for the construction of a 68,000 square foot manufacturing facility ("the Building"). [DE 20-1, at 2]. "As

part of its obligations as general contractor, Denham-Blythe contracted with several Contractors to complete the design and construction process[,]" including BlueScope, Varco Pruden Buildings ("Varco") (a division of BlueScope), and Arrow Metals and Coatings, Inc. ("Arrow"). [DE 29, at 2].

"Denham-Blythe and Asahi utilized AIA Document A141 – 2004 Standard Form of Agreement Between Owner and Design-Builder, with modifications specific to this job, for the Contract." [DE 20-1, at 2 (citing [DE 20-2])]. The Contract defines a "Contractor" as follows:

> § A.1.1.4 CONTRACTOR
> A Contractor is a person or entity, other than the Architect, that has a direct contract with the Design-Builder to perform all or a portion of the construction required in connection with the Work. The term "Contractor" is referred to throughout the Design-Build Documents as if singular in number and means a Contractor or an authorized representative of the Contractor . . . .

[DE 29, at 2-3 (citing [DE 23-1, at 14])]. On March 2, 2012, the roof of the Building was damaged by severe winds and was subsequently repaired by Denham-Blythe. [DE 20-1, at 2]. Again, on March 1, 2017, the roof of the Building sustained damage from severe winds, and Denham-Blythe completed both the temporary repair work and permanent repair work. *Id.*

After the roof was damaged on March 1, 2017, Asahi submitted property damages claims to its insurer, Plaintiff Mitsui Sumitomo Insurance USA, Inc. ("Mitsui"). *Id.* "According to the Complaint,

Mitsui Sumitomo made payments to Asahi in response to the claims in the amount of $1,315,092.00 under policy PKG3126694 (hereinafter referred to as 'the Policy') with effective dates of October 1, 2016 through October 1, 2017." *Id.* (citing [DE 20-3]). On February 22, 2018, Mitsui, as subrogee of Asahi, filed its Complaint [DE 1] against Denham-Blythe, BlueScope, Varco, and Arrow asserting subrogation rights against Defendants for the amounts paid to repair the property damage caused by the 2017 severe winds. [DE 1]. Mitsui's claims against Denham-Blythe include negligence, breach of contract, breach of warranty of workmanlike services, and negligent misrepresentation. *Id.* Mitsui's allegations against BlueScope and Varco include negligence, negligent misrepresentation, breach of warranty of workmanlike service, and breach of contract and third-party beneficiary. *Id.* On April 13, 2018, Denham-Blythe filed the present Motion to Dismiss [DE 20], and on February 15, 2019, BlueScope filed the present Motion for Judgment on the Pleadings [DE 28] requesting Mitsui's claims against BlueScope and Varco be dismissed. BlueScope's Motion for Judgement on the Pleadings [DE 28] is nearly identical to Denham-Blythe's Motion to Dismiss [DE 20]. The only substantial difference between the two Motions [DE 20; DE 28] is that BlueScope's Motion [DE 28] omitted Denham-Blythe's argument that the claim is barred by the dispute resolution clauses in the contract.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) provides that a complaint may be attacked for failure "to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U. S. 544, 570 (2007)). "A motion to dismiss is properly granted if it is beyond doubt that no set of facts would entitle the petitioner to relief on his claims." *Computer Leasco, Inc. v. NTP, Inc.*, 194 F. App'x 328, 333 (6th Cir. 2006). When considering a Rule 12(b)(6) motion to dismiss, the court will presume that all the factual allegations in the complaint are true and draw all reasonable inferences in favor of the nonmoving party. *Total Benefits Planning Agency v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citing *Great Lakes Steel v. Deggendorf*, 716 F.2d 1101, 1105 (6th Cir. 1983)). "The court need not, however, accept unwarranted factual inferences." *Total Benefits Planning Agency*, 552 F.3d at 434 (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

"The standard of review for a judgment on the pleadings [pursuant to Federal Rule of Civil Procedure 12(c)] is the same as that for a motion to dismiss under Federal Rule of Civil Procedure

12(b)(6)." *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,*
477 F.3d 383, 389 (6th Cir. 2007).

<u>**DISCUSSION**</u>

<u>**A. DEFENDANT DENHAM-BLYTHE'S MOTION TO DISMISS PURSUANT TO RULE 12(B)(6)**</u>

In support of dismissal, Defendant Denham-Blythe argues the following: (1) "Kentucky law recognizes the sacred right to contract;" (2) "[t]he claim is barred by the waiver of subrogation clause contained in the design build contract between Denham-Blythe and Asahi Bluegrass Forge Corporation;" (3) "[t]he insurance policy issued by Plaintiff to Asahi Bluegrass Forge Corporation granted Asahi the right to waive subrogation;" and (4) "[t]he claim is barred by the dispute resolution clauses in the contract." [DE 20-1, at 1].

<u>**1. KENTUCKY LAW AND THE RIGHT TO CONTRACT**</u>

Denham-Blythe correctly asserts, "Kentucky Courts have long honored the freedom to contract[,]" and "The Kentucky Supreme Court has affirmed this principle many times." [DE 20-1, at 4].[1]
"Generally, the doctrine of freedom to contract prevails and, in

---

[1] To support these assertions, Denham-Blythe cites to both *Frear v. P.T.A. Industries, Inc.,* 103 S.W.3d 99, 106 (Ky. 2003) and *Mullins v. N. Kentucky Inspections, Inc.,* No. 2009-CA-000067-MR, 2010 WL 3447630, at *1-2 (Ky. Ct. App. Sept. 3, 2010) (citing *Jones v. Hanna,* 814 S.W.2d 287, 289 (Ky. Ct. App. 1991)). However, Denham-Blythe misattributes a quote from *Mullins* as a quote from *Frear,* likely due to the *Mullins* Court citing *Frear.* [DE 20-1, at 4 (incorrect citations omitted)]. Additionally, the citation number Denham-Blythe provides for *Mullins* is, in fact, the citation number for *Frear.* In the future, to better serve both their client and judicial economy, Denham-Blythe's counsel should proofread their pleadings before filing them with the Court.

the absence of ambiguity, a written instrument will be enforced strictly according to its terms." *Mullins v. N. Kentucky Inspections, Inc.,* No. 2009-CA-000067-MR, 2010 WL 3447630, at *1 (Ky. Ct. App. Sept. 3, 2010) (citing *Frear v. P.T.A. Industries, Inc.*, 103 S.W.3d 99, 106 (Ky. 2003)); *see also Commonwealth v. L. G. Wasson Coal Mining Corp., Ky.*, 358 S.W.2d 347 (1962) ("In considering the legality of Contract B, we recognize the sacred right to contract without undue interference."). In *Mullins,* the Supreme Court of Kentucky recited *Jones v. Hanna*, 814 S.W.2d 287, 289 (Ky. Ct. App. 1991) as follows:

> "[C]ontracts voluntarily made between competent persons are not to be set aside lightly. As the right of private contract is no small part of the liberty of the citizen, the usual and most important function of courts is to enforce and maintain contracts rather than to enable parties to escape their obligations on the pretext of public policy or illegality. If the legality of the contract can be sustained in whole or in part under any reasonable interpretation of its provisions, courts should not hesitate to decree enforcement."

*Mitsui,* 2010 WL 3447630, at *1 (quoting *Jones,* 814 S.W.2d at 289).

"The terms of an unambiguous contract cannot be varied by extrinsic evidence." *Luttrell v. Cooper Industries, Inc.,* 60 F. Supp. 2d 629, 631 (E.D. Ky. Oct. 27, 1998) (citing *O.P. Link Handle Co. v. Wright,* 429 S.W.2d 842 (Ky. 1968)). "Thus, a court may not consider parol evidence when interpreting a contract unless the contract is ambiguous." *Luttrell,* 60 F. Supp. 2d at 631 (citing *Schachner v. Blue Cross and Blue Shield of Ohio,* 77 F.3d 889, 893

(6th Cir. 1996)). "Contract language is not ambiguous unless it is subject to two reasonable interpretations." *Id; see also Hazard Coal Corp. v. Knight,* 325 S.W.3d 290, 298 (Ky. 2010) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 385 (Ky. Ct. App. 2002) ("'A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations.'")). "The determination that a contract suffers from ambiguity must be based upon the common, plain meaning of the language of the contract." *Luttrell,* 60 F. Supp. 2d at 631 (citing *Kentucky-West Virginia Gas Co. v. Browning* 521 S.W.2d 516 (Ky. 1975)). In *Luttrell,* the Court, finding it "is not required to read a contract in a vacuum," stated the following:

> "A contract is to be construed as a whole so as to ascertain and give effect to the true intent of the parties, and the circumstances under which the contract was executed and the conduct of the parties thereafter can be considered by the Court in determining what their intention was, without it becoming a violation of the parol evidence rule."

*Luttrell,* 60 F. Supp. 2d at 631 (quoting *Rudd-Melikian, Inc. v. Merritt*, 282 F.2d 924, 928 (6th Cir.1960)). "'If the language is unambiguous, the meaning of the language is a question of law, and the intent of the parties must be discerned from the words used in the instrument.'" *Luttrell,* 60 F. Supp. 2d at 631 (quoting *Taggart v. U.S.* 880 F.2d 867, 870 (6th Cir. 1989)). "The court will not create an ambiguity where none exists." *Friction Materials Co., Inc. v. Stinson,* 833 S.W.2d 388 (Ky. Ct. App. 1992)).

Additionally, Denham-Blythe argues that under Kentucky law, contracts with exculpatory clauses are generally treated the same as any other contract. [DE 20-1, at 5 (citing *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.,* 238 S.W.3d 644 (Ky. 2007))]. In *Cumberland Valley Contractors, Inc.*, the Supreme Court of Kentucky found, "Recognizing the importance of freedom to contract, the courts of this Commonwealth have traditionally enforced exculpatory provisions unless such enforcement violates public policy." *Cumberland Valley Contractors, Inc.,* 238 S.W.3d at 650 (citing *Cobb v. Gulf Refining Co.,* 145 S.W.2d 96, 99 (1940)). Citing *Cumberland Valley Contractors, Inc.*, Denham-Blythe argues, "[I]t is clear that Kentucky courts will enforce the contractual terms absent some strong public policy to the contrary. There is no statutory or case law setting forth a public policy prohibiting or limiting wavier of subrogation clauses." [DE 20-1, at 5 (citing *Cumberland Valley Contractors, Inc.,* 238 S.W.3d at 650)].

Mitsui neither disputes that Kentucky law honors the basic right to contract nor contends that a public policy prohibiting or limiting waiver of subrogation clauses exists. [DE 25]. Instead, as will be discussed further herein, Mitsui argues the Contract [DE 20-2] is ambiguous, so the Court should deny Denham-Blythe's Motion to Dismiss [DE 20] and allow the Parties to engage in discovery to determine the intent of the contracting parties. [DE 25, at 13-17].

## 2. WHETHER THE CLAIM IS BARRED BY THE WAIVER OF SUBROGATION CLAUSE

Denham-Blythe argues Mitsui admitted the Contract [DE 20-2] exists and is, therefore, bound by the terms of the Contract [DE 20-2] because "Mitsui Sumitomo claims [in its Complaint [DE 1, at 5]]that it is 'legally, equitably, and contractually subrogated to the claims of Asahi' against Denham-Blythe due to the payments [Mitsui] made to its insured[, Asahi]." [DE 20-1, at 5-6]. Denham-Blythe asserts that waiver of subrogation clauses in construction contracts "'effectively abrogate[e] any subrogation right of the owner's insurance against the contractor.'" [DE 20-1, at 6 (quoting *Church Mut. Ins. Co. v. Palmer Constr. Co., Inc.,* 153 F. App'x 805 (2005) (citing *Commercial Union Ins. Co. v. Bituminous Cas. Corp.,* 851 F.2d 98, 101 (3d Cir. 1988)))]. In addition to citing *Church Mut. Ins. Co.*, Denham-Blythe cites several Pennsylvania cases to support its argument that Mitsui, as subrogor, is bound to the same contractual language as the subrogee, Asahi. [DE 20-1, at 6 (citing *Church,* 851 F.2d 98; *Allstate Ins. Co. v. Clark*, 527 A.2d 1021, 1024 (Pa. Super. Ct. 1987); *Bell v. Slezak*, 812 A.2d 566, 574 n.8 (Pa. 2002); *Chow v. Rosen*, 812 A.2d 587, 590 (Pa. 2002))].

Mitsui neither contests the subrogee/subrogor relationship nor argues a waiver of subrogation clause in a construction contract fails to abrogate an insurer's subrogation right. [DE 25]. Additionally, Mitsui does not claim its policy did not grant

Asahi the right to waive subrogation. However, Mitsui contends that the waiver clause in the present Contract [DE 20-2] does not bar claims of loss that occur after the completion of construction.

The waiver of subrogation clause found in § A.11.4.7 of AIA Document A141 – 2004 Exhibit A of the Contract [DE 20-2] states the following:

> The Owner and Design-Builder waive all rights against each other and any of their consultants, separate contractors described in Section A.6.1, if any, Contractors, Subcontractors, agents and employees, each of the other, and any of their contractors, subcontractors, agents, and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to Section A.11.4 or other property insurance applicable to the Work, except such rights as they have to proceeds of such insurance held by the Owner as fiduciary. The Owner or Design Builder, as appropriate, shall require of the separate contractors described in Section A.6.1, if any, and the Contractors, Subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, even though the person or entity did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.

[DE 20-2, at 44]. Regarding the waiver of subrogation clause, Denham-Blythe argues the following:

> This clause clearly and unambiguously bars any subrogation claim brought by any insurance company applicable to the "Work," so long as the insurance policy recognizes the right of a waiver of subrogation. In

addition, the clause expressly states it applies to bar claims against an entity, even if that entity did not pay premiums, and regardless of whether the entity has an insurable interest in the property.

[DE 20-1, at 7]. Pursuant to § A.1.1.6 of AIA Document A141 – 2004 Exhibit A of the Contract [DE 20-2], "Work" is defined as follows:

The term "Work" means the design, construction and services required by the Design-Build Documents, whether completed or partially completed, and includes all other labor, materials, equipment and services provided or to be provided by the Design-Builder to fulfill the Design-Builder's obligation. The Work may constitute the whole or a part of the Project.

[DE 20-2, at 20]. Additionally, pursuant to § A.1.1.7 of AIA Document A141 – 2004 Exhibit A of the Contract [DE 20-2], "The Project is the total design and construction of which the Work performed under the Design-Build Documents may be the whole or a part, and which may include design construction by the Owner or by separate contractors." *Id.*

Denham-Blythe posits that "'the Work' is specifically defined to include all services performed by Denham-Blythe, including the completed building." [DE 20-1, at 7-8]. Denham-Blythe further argues the language in the waiver of subrogation clause stating "'[a] waiver of subrogation shall be effective . . . *whether or not the person or entity had an insurable interest in the property damaged*,'" constitutes express terms that "demonstrate the parties' intent that the waiver would be enforceable to bar subrogation claims for property damage payments made after

11

construction." *Id.* at 8-9 (citing *Town of Silverton v. Phoenix Heat Source System, Inc.,* 948 P.2d 9 (Co. App. 1997)). To support its argument that the waiver applies post-construction, Denham-Blythe primarily relies on two cases: *Auto. Ins. Co. of Hartford, Connecticut v. United H.R.B. General Contractors, Inc.,* 876 S.W.2d 791 (Mo. Ct. App. 1994) and *Royal Surplus Lines Ins. Co. v. Weis Builders, Inc.,* No. Civ.A. 04-440-C, 2006 WL 897078 (W.D. Ky. Apr. 3, 2006).

In *United H.R.B.*, First Baptist entered into a contract with the defendants to construct a new church. *United H.R.B.,* 876 S.W.2d at 792. Following the substantial completion of the church, First Baptist purchased an insurance policy from the plaintiff, and the effective dates were June 1, 1986 through June 1, 1987. *Id.* Final payment on the contract was made on December 22, 1986, and on May 24, 1987, the church was damaged by a fire. *Id.* The plaintiff alleged the fire was the result of a faulty electrical system and that plaintiff was a subrogated insurer of First Baptist. *Id.* The defendants claimed the waiver of subrogation clause and definition of "work" in the construction contract "exonerated and discharged United H.R.B. from any claim by plaintiff based on fire damage done to the church as a result of construction activity, even though the fire occurred after final payment on the contract." *Id.* at 793.

Here, Denham-Blythe argues that in *United H.R.B.,* the Missouri Court of Appeals "ruled it could not determine the intent of the parties from the terms of the contract" and "relied heavily on the fact the builder no longer had an insurable interest in the building when the fire occurred, and the waiver of subrogation clause did not specify it applied absent an insurable interest." [DE 20-1, at 8 (citing *United H.R.B.,* 876 S.W.2d 791)]. However, this was the *United H.R.B.* defendant's argument not the *United H.R.B.* Court's ruling. *United H.R.B.*, 876 S.W.2d at 793-94. Instead, the *United H.R.B.* Court's decision turned on the fact that several clauses in the contract directly contradicted one another. *Id.* at 793-95. Specifically, the contract included a general waiver provision that "contain[ed] no express language as to the duration of the waiver" and another provision that dealt specifically with waivers that resulted from the making of final payment. *Id.* at 794. Finding the contract was ambiguous and giving preference to specific provisions over general provisions, the *United H.R.B.* Court held, "[T]he making of final payment terminated the general waiver of Subparagraph 11.3.6 and triggered the waiver provisions of Paragraph 9. Subparagraph 9.9.4.2 specifically provides that the owner does not waive its claims for faulty or defective work appearing after substantial completion." *Id.* at 795.

While the *United H.R.B.* Court found the contract was ambiguous due to a final payment provision that contradicted a waiver of subrogation clause, Mitsui argues, "The *United H.R.B.* holding is analogous to the Construction Contract currently before the Court because contradictions in the waiver of subrogation clause and the indemnification clause create ambiguity as a matter of law." [DE 25, at 15]. The indemnification clause reads as follows:

> § A.3.17.1 To the fullest extent permitted by law, the Design-Builder shall indemnify and hold harmless the Owner, Owner's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, or arising out of the failure of Design-Builder to perform its obligations under the Design-Build Contract, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death or to injury to or destruction of tangible property, but only to the extent caused by the negligent acts or omissions of the Design-Builder, Architect, a Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge or reduce other rights or obligations of indemnity that would otherwise exist as to a party or person described in this Section A.3.17.

[DE 20-2, at 30]. Specifically, Mitsui asserts the following:

> Like in *United H.R.B.*, the idea that Defendant must indemnify Plaintiff for claims "arising out of the failure of Design-Builder to perform its obligations under the Design-Build Contract" and for "destruction of tangible property" due to the "negligent acts or omissions of [Defendant]" is contradictory to Plaintiff and Defendant's waiver of "all rights" to damages caused by "fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section

> A.11.4 or other property insurance applicable to the
> Work." (Exhibit B at 4, 27). Defendant is contractually
> obligated to compensate Plaintiff for loss yet the
> contract language prevents Plaintiff from asserting a
> claim for damages.

[DE 25, at 16-17].

Denham-Blythe is correct to dispute Mitsui's assertion that the waiver of subrogation and indemnification clauses in the present case make the Contract ambiguous and are analogous to the general waiver clause and final payment provision in *United H.R.B.* because indemnification and subrogation are different concepts and address different rights. [DE 26, at 6-8 (citing *KFC Corp. v. Wagstaff*, 502 B.R. 484, 501 n. 14 (W.D. Ky. 2013))]. Here, the indemnification clause requires Denham-Blythe to indemnify Asahi for third-party claims brought against Asahi that are attributable to the negligence of Denham-Blythe or its contractors. [DE 20-2, at 30]. On the other hand, the waiver of subrogation clause waives Asahi and Denham-Blythe's rights to claims against each other. [DE 20-2, at 44]. Since the two clauses address clearly different contractual rights that coexist within the contract, they are not ambiguous.

In *Royal Surplus,* The Gardens-Louisville, L.P. ("The Gardens"), an owner, entered into a contract with a contractor to build two assisted living facilities. *Royal Surplus*, 2006 WL 897078, at *1. No later than December 31, 2002, the two buildings were substantially completed and final payment was made. *Id.* In

January 2003, sprinkler pipes in both buildings froze, burst, and caused substantial water damage to the buildings. *Id.* The plaintiff provided property insurance to the Gardens and reimbursed the Gardens in excess of $300,000.00 for the water damage. *Id*. Following its reimbursement to the Gardens, the plaintiff brought an action as the Gardens' subrogee, alleging claims for breach of contract, breach of warranty, and negligence. *Id.*

Moving for summary judgment, the *Royal Surplus* contractor and subcontractors argued the plaintiff's claims were barred by the waiver provision in the construction contract which read as follows:

> Notwithstanding anything in this Agreement to the contrary, Owner and Contractor hereby waive and release each other from any and all right of recovery, claim, action, or cause of action against (a) each other, their subcontractors, agents, officers and employees and (b) the Architect and its consultants, contractors, agents, officers, and employees, for any loss or damage that may occur to the Project, improvements to the Project, or personal property within the Project by reason of fire or the elements, accident, or other casualty, regardless of whether the negligence or fault of the other party or their agents, officers, employees or contractors caused such loss, to the extent the same is insured against under insurance policies carried by the waiving party (or required to be carried by such party). Owner and Contractor shall obtain a waiver of subrogation from the respective insurance companies which have issued policies of insurance covering all risk of direct physical loss, and to have the insurance policies endorsed, if necessary, to prevent the invalidation of the insurance coverages by reason of the mutual waivers. The Contractor shall cause each contract with each Subcontractor to contain a similar waiver in favor of the Owner, Contractor, Architect, and their respective

> subcontractors, agents, consultants, officers and
> employees.

*Id.* The foregoing waiver provision is not contained in AIA-A111

and was instead drafted and inserted in the contract by the parties

in place of the following standard provisions of AIA-A111

pertaining to property insurance:

> If during the Project construction period the Owner
> insures properties, real or personal or both, at or
> adjacent to the site by property insurance under
> policies separate from those insuring the Project, or if
> after final payment property insurance is to be provided
> on the completed Project through a policy or policies
> other than those insuring the Project during the
> construction period, the Owner shall waive all rights in
> accordance with the terms of Subparagraph 11.4.7 for
> damages caused by fire or other causes of loss covered
> by this separate property insurance. All separate
> policies shall provide this waiver of subrogation by
> endorsement or otherwise.

> AIA-A111, § 11.4.5. Subparagraph 11.4.7, "Waivers of
> Subrogation," states that

> > The Owner and Contractor waive all rights
> > against (1) each other and any of their
> > subcontractors, sub-subcontractors, agents
> > and employees, each of the other, and (2) the
> > Architect, Architect's consultants, separate
> > contractors described in Article 6, if any,
> > and any of their subcontractors, sub-
> > subcontractors, agents and employees, for
> > damages caused by fire or other causes of loss
> > to the extent covered by property insurance
> > obtained pursuant to this Paragraph 11.4 or
> > other property insurance applicable to the
> > Work, except such rights as they have to
> > proceeds of such insurance held by the Owner
> > as fiduciary.... A waiver of subrogation shall
> > be effective as to a person or entity even
> > though that person or entity would otherwise
> > have a duty of indemnification....

```
                    AIA-A111, § 11.4.7.
```

*Id.* at 2-3.[2] In response to the defendants' motions for summary judgment, the plaintiff argued the waiver provision in the contract "d[id] not apply to incidents occurring after the substantial completion and final payment of the contract." *Id.* at 2.

In making its determination, the *Royal Surplus* Court focused its analysis on both the waiver provision in the contract and how the contract defined the terms "Project" and "Work." *Id.* at 3-5. The only difference between the terms "Project" and "Work" in the *Royal Surplus* contract and the present Contract is that both the provisions in the present Contract include the term "design" and refer to the contract documents as "Design-Build Documents," whereas the *Royal Surplus* provisions do not. The *Royal Surplus* Court found the following:

> The Contract does not contain any reference to the parties' rights and obligations beyond the terms of the contract, and the court will not imply one. At some point, "the Project" becomes "the buildings," and the terms of the construction contract, except to the extent otherwise specified, cease to bind the parties. Here, once the contractor had performed and provided everything upon which the parties had agreed in the Contract ("the total construction") and payment was made, the Project was terminated.

*Id.* at 3.

---

[2] Denham-Blythe incorrectly cites the standard language found in AIA-A111, § 11.4.5 as the language used in the *Royal Surplus* parties' modified waiver provision. [DE 20-1, at 9].

Finding the waiver provision did not extend to post-construction claims, the Court pointed to the omission of AIA-A111 sections 11.4.5 and 11.4.7, stating, "The parties intentionally chose not to include AIA-A111 sections 11.4.5 and 11.4.7, which clearly extend the waiver beyond completion of the contract if property insurance is obtained on the completed Project, in the Contract." *Id.* at 4-5.[3] Furthermore, the *Royal Surplus* Court found the following:

> AIA-A111 section 11.4.5 differentiates between "the Project" and "the completed Project." Weis and The Gardens used the AIA-A111 definition of "the Project." As indicated by the "Project" / "completed Project" distinction contained in AIA-A111 section 11.4.5, that term is limited to pre-completion, and nothing in the Contract supports the suggestion that the parties intended to apply a different meaning. Because "the Project," as defined in the Contract, is customarily understood to terminate upon completion, and because the parties failed to include an express post-completion waiver of claims, the court's narrow interpretation of the waiver clause comports with industry standards. The norm is tailored to serve the policy behind waivers of claims; waiver clauses are intended to avoid disruption caused by litigation, which is no longer a concern once the contract has been fulfilled.

*Id.* at 5 (citing *Trinity Universal Ins. Co. v. Bill Cox Constr., Inc.,* 75 S.W.3d 6, 12-13 (Tex. App. 2001)).

---

[3] Ignoring the fact that the *Royal Surplus* Court referred to the omission of both AIA-A111 section 11.4.5 *and* 11.4.7, Denham-Blythe incorrectly quotes the *Royal Surplus* Court's holding as follows:

> The ruling was based on the omission of section 11.4.7 and the language expressly stating the Waiver of Subrogation was applicable even after a party no longer has an insurable interest in the property. The Court noted the terms of 11.4.7 "clearly extended the waiver beyond completion of the contract if property insurance is obtained on the completed project.

[DE 20-1, at 9].

Like the contract in *Royal Surplus,* in the present case, the Contract is silent regarding post-construction subrogation claims. While the Contract included section 11.4.7, it omitted section 11.4.5, which would have extended the waiver beyond completion of the Contract. Since there is no express waiver of subrogation clause regarding post-completion of the Contract or post-construction of the Building, and the term "Project" is limited to pre-completion, the waiver of subrogation clause only applies to claims by Asahi's insurer during construction of the Building. *Id.* Accordingly, the Court finds the waiver of subrogation clause does not extend to post-construction claims.

### 3. WHETHER PLAINTIFF'S CLAIM IS BARRED BY THE DISPUTE RESOLUTION CLAUSES IN THE CONTRACT

Denham-Blythe argues section A.4.3.1 of the Contract requires the Parties "submit this matter to nonbinding mediation," and in the event mediation is unsuccessful, section A.4.4.1 requires "the parties must submit this matter to arbitration." [DE 20-1, at 13]. Specifically, sections A.4.3.1 and A.4.4.1 of the Contract state the following:

> § A.4.3.1
> Any claim arising out of or related to the Design-Build Contract, except those waived as provided for in Section A.4.1.10, A.9.10.4 and A.9.10.5, shall, after initial decision of the Claim or 30 days after submission of the Claim for initial decision, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable or other binding dispute resolution proceedings by either party.

§ A.4.4.1
Claims, except those waived as provided for in Sections A.4.1.10, A.9.10.4 and A.9.10.5, for which initial decisions have not become final and binding, and which have not been resolved by mediation, but which are subject to arbitration pursuant to Sections 6.2 and 6.3 of the Agreement or elsewhere in the Design-Build Documents, shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect at the time of the arbitration. The demand for arbitration shall be filed in writing with the other party to the Design-Build Contract and with the American Arbitration Association.

[DE 20-2, at 32-33].

In addition to Denham-Blythe citing the aforementioned dispute resolution provisions, Denham-Blythe asserts, "Kentucky jurisprudence favors the enforcement of private arbitration contracts[,]" and "there is a strong federal policy favoring arbitration, 'even where the results would be the possibly inefficient maintenance of separate proceedings in different forums.'" [DE 20-1, at 12 (citing *Kodak Mining Co. v. Carrs Fork Corp.,* 669 S.W.2d 917, 919 (Ky. 1984); *Fite and Warmath Construction Co., Inc. v. MYS Corp.,* 559 S.W.2d 729, 734 (Ky. 1977); *Prudential Resources Corp. v. Plunkett,* 583 S.W.2d 97, 99 (Ky. 1979); *Answers in Genesis of Ky., Inc. v. Creation Minstries Int'l. Ltd.,* 556 F.3d 467, 468 (6th Cir. 2009); *Moses H. Cone Mem'l Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24 (1983); *Telecom Decision Makers, Inc. v. Birch Comm's, Inc.,* 2015 WL 5722817, at *3 (W.D. Ky. Sept. 29, 2015), *aff'd,* 654 F. App'x 218 (6th Cir.

2016))]. Denham-Bltyhe further asserts, "Kentucky Courts have consistently noted that arbitration clauses contained in contracts between architects and owners are enforceable." [DE 20-1, at 12 (citing *Conrad v. Humphrey,* 84 S.W. 313 (Ky. 1905); *Buck Run Baptist Church, Inc. v. Cumberland Sur. Ins. Co., Inc.,* 983 S.W.2d 501 (Ky. 1988); *Stewart Services, Inc. v. Tilford Mechanical Contractors, Inc.,* 2004 WL 1046370 (Ky. Ct. App. May 7, 2004); *Presnell Const. Managers, Inc. v. EH Const., LLC,* 134 S.W.3d 575 (Ky. 2004))]. Mitsui does not dispute Denham-Blythe's assertions that Kentucky jurisprudence and federal policy favor arbitration and arbitration clauses are enforceable. [DE 25]. Instead, while acknowledging Denham-Blythe referred to sections A.4.3.1 and A.4.4.1, Mitsui contends, "[Denham-Blythe] omits discussion of § A.4.2.2 which in fact precludes the parties from engaging in alternative dispute resolution." [DE 25, at 17].

Section A.4.2.2 of the Contract states the following:

> If the parties have not identified a Neutral in Section 6.1 of the Agreement or elsewhere in the Design-Build Documents then, except for those claims arising under Sections A.10.3 and A.10.5, the Owner shall provide an initial decision. An initial decision by the Owner shall be required as a condition precedent to mediation of all Claims between the Owner and Design-Builder arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Owner with no decision having been rendered by the Owner.

[DE 20-2, at 32]. Pursuant to Section A.4.2.3:

> The initial decision pursuant to Sections A.4.2.1 and A.4.2.2 shall be in writing, shall state the reasons

> therefore and shall notify the parties of any change in
> the Contract Sum or Contract Time or both. The initial
> decision shall be final and binding on the parties but
> subject first to mediation under Section A.4.3 and
> thereafter to such other dispute resolution methods as
> provided in Section 6.2 of the Agreement or elsewhere in
> the Design-Build Documents.

*Id.* Mitsui correctly asserts Sections A.10.3 and A.10.5 "concern claims regarding hazardous materials which are irrelevant here." [DE 25, at 18 (citing [DE 20-2, at 42])]. Regarding Section 6.1 of the Agreement, the contracting parties were directed to appoint an "individual to serve as a Neutral pursuant to Section A.4.2 of Exhibit A, Terms and Conditions," but the contracting parties chose not to do so. [DE 20-2, at 6]. Since the contracting parties failed to identify a Neutral, Section A.4.2.2 required Asahi, the Owner, to provide an initial decision. [DE 20-2, at 32].

According to the plain meaning of Section A.4.2.2, Asahi was required to make an initial decision as a condition precedent to the mediation of claims *arising prior to the date final payment was due or within thirty (30) days of the claim being referred to Asahi for an initial decision*. *Id.* (emphasis added). The claim in question did not arise prior to the date final payment was due. However, more than thirty days have passed since the claim was submitted to Asahi for an initial decision. Mitsui's argument that "the parties cannot proceed to other alternative dispute resolutions of the Construction Contract since Asahi's [initial] decision in this case was to have its carrier file this suit in

23

lieu of mediation" is unavailing. [DE 25, at 18]. A legal action, such as the present case, is not an initial decision as intended under Section A.4.2. Instead, pursuant to Sections A.4.2.2, A.4.2.3, A.4.3.1, and A.4.4.1, the initial decision was meant to be a written decision by Asahi that would have been final and binding but first must have been subject to mediation, and ultimately, if mediation did not resolve the matter, the claim would be subject to arbitration. [DE 20-2, at 32-33].

Mitsui correctly asserts, "Courts must 'place arbitration agreements on equal footing with other contracts . . . enforce[ing] them according to their terms.'" [DE 25, at 17-18 (citing *Scott v. Louisville Bedding Co.,* 404 S.W.3d 870, 875 (Ky. Ct. App. 2013)(citing *AT&T Mobility LLC v. Conception,* 131 S.Ct. 1740, 1745(2011)))]. Pursuant to the terms of the present dispute resolution provisions, absent an initial decision from Asahi, and thirty (30) days having passed after submission of the claim to Asahi for initial decision, the claim was subject to mediation then arbitration. [DE 20-2, at 32-33]. In lieu of the contracting parties mediating as directed by the Contract, Mitsui, as subrogee of Asahi, brought this action. As Denham-Blythe correctly asserts, to allow Asahi to ignore the express dispute resolution provisions found in the Contract that require mediation and arbitration and file a lawsuit instead would run afoul of both Kentucky and federal precedent and policy and render dispute resolution provisions

24

"null and void." [DE 26, at 8-9]. If a contracting party could avoid mediation and arbitration by opting to file a lawsuit, dispute resolution provisions requiring mediation and arbitration would serve no purpose because parties who do not favor mediation or arbitration would simply file a lawsuit to avoid alternative dispute resolution. Accordingly, the Court will grant Denham-Blythe's Motion to Dismiss [DE 20], dismiss this action without prejudice, and direct Mitsui to comply with the dispute resolution provisions set forth in the Contract.

## B. DEFENDANT BLUESCOPE'S MOTION FOR JUDGMENT ON THE PLEADINGS

Like Defendant Denham-Blythe, Defendant BlueScope argues the following: (1) "Kentucky law recognizes the sacred right to contract;" (2) "[t]he claim is barred by the waiver of subrogation clause contained in the design build contract between Denham-Blythe and Asahi Bluegrass Forge Corporation, under which BlueScope is a defined Contractor;" and (3) "[t]he insurance policy issued by Plaintiff to Asahi Bluegrass Forge Corporation granted Asahi the right to waive subrogation." [DE 29]. Unlike Denham-Blythe, BlueScope does not argue the claim is barred by the dispute resolution clauses in the contract. Since BlueScope fails to make the dispute resolution clause argument that required Denham-Blythe's Motion to Dismiss [DE 20] be granted, and the waiver of subrogation clause in the Contract does not bar post-construction claims, the Court will deny BlueScope's Motion for Judgment on the

Pleadings [DE 28]. Nevertheless, Mitsui's claims against BlueScope, Varco, and all other Defendants shall be dismissed without prejudice because the Contract required the Parties to mediate this claim, and if mediation did not resolve the issue, to participate in arbitration.

**CONCLUSION**

Therefore, having considered the matter fully, and being otherwise sufficiently advised,

**IT IS ORDERED** as follows:

(1) Defendant Denham-Blythe Company, Inc's Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) [DE 20] is **GRANTED;**

(2) Defendant BlueScope Buildings North America, Inc.'s Motion for Judgment on the Pleadings [DE 28] is **DENIED;**

(3) This matter is **DISMISSED WITHOUT PREJUDICE;**

(4) This is a final and appealable order; and

(5) Plaintiff Mitsui Sumitomo Insurance USA, Inc. shall **COMPLY** with the dispute resolution provisions set forth in the Contract.

This the 21st day of March, 2019.



Signed By:

*Joseph M. Hood*

Senior U.S. District Judge